UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| TERRI POWERS,                          ) | |
|        Plaintiff                   ) | |
| vs.                                       ) | CAUSE NO. 4:07-cv-00062-DFH-WGH |
| NATIONAL RURAL LETTER ) CARRIERS' ASSOCIATION ) LONG-TERM DISABILITY ) INCOME PLAN,                ) | |
|        Defendant          ) | |

**BRIEF IN SUPPORT OF PLAINTIFF'S COMPLAINT**

**I.    Introduction**

This action arises under the Employee Retirement Income Security Act (ERISA), found at 29 U.S.C. § 1101 *et seq.* (Complaint, Section 1, ¶ 1; Answer). Plaintiff, Terri Powers ("Powers"), received Long Term Disability Benefits from Defendant, National Rural Letter Carriers' Association Long-Term Disability Income Plan ("the Plan"), from the time she stopped working for the United States Postal Service in 1998 until the Plan terminated those benefits on April 15, 2006 (Complaint, Section II, ¶ 7; Answer). Powers appeals the termination of her benefits. This Court has jurisdiction of this case pursuant to 29 U.S.C. § 1132(e) (Complaint, Section I, ¶ 1; Answer).

**II.    Standard of Review**

The parties agree that the standard of review in this case is whether the Plan's termination of Powers' benefits was arbitrary and capricious (Case Management Plan, Section II). This

standard gives great deference to the Plan's decision, which cannot be overturned unless the decision "was a downright unreasonable one." *Dabertin v. HCR Manor Care, Inc.*, 373 F.3d 822, 828 (7th Cir. 2004). But even review under this standard does not amount to a rubber stamp. *Id.* The Plan must articulate a rational connection between the facts found, the issue to be decided, and the choice made. *Id.* In some cases, "simple common sense will require the court to pronounce an administrator's determination arbitrary and capricious." *Id.* This is just such a case.

### III.   Facts

Nearly all of the facts in this case are undisputed.

Powers was born in 1956 (Powers Claim File (hereafter referred to simply with an "R.") at 805). She has a high school education (R. 618). For 21 years, she worked as a rural mail carrier (R. 618). The job required lifting of up to 70 pounds, carrying of at least 45 pounds, and constant pushing (R. 808).

Powers applied for Long Term Disability Income Benefits on June 18, 1998 (R. 799-807). Her claim was approved by letter dated October 9, 1998 (R. 667-69) with a disability date of March 27, 1998, an elimination period of 90 days, and an initial payment effective date of June 25, 1998 (R. 669). The award was "based on the conditions of Chronic Low Back Pain, Lumbar Facet Arthritis and spondylolisthesis." (R. 668).

The Plan provides that benefits will be terminated if Powers becomes "no longer Disabled." (R. 71). For the first 24 months of entitlement, Powers was disabled as long as she could no longer perform the essential duties of a rural mail carrier (R. 82). Thereafter, she is entitled to continuing benefits only if she is unable to perform the essential duties of any occupation (R. 82). "Any Occupation" is defined as an occupation (1) for which she is qualified

by education, training, or experience; and (2) that has an earnings potential greater than an amount equal to the product of her pre-disability earnings and the benefit percentage for which she is enrolled (R. 80).

With the time for the change in definition from "own occupation" to "any occupation" approaching, the Plan's Administrator, The Hartford, undertook a Hypothetical Transferable Skills Analysis of Powers' case on January 5, 2000 (R. 618-26). Hartford sought to find out if Powers had "the skills necessary to cross over to other occupations. . . ." (R. 618). Powers was assumed to have the ability to perform the full range of sedentary activity (R. 618).

The analysis concluded that "[t]here were no matches at the good level of Transferable Skills." (R. 618). An extension of the parameters of the search resulted in two jobs: Election Clerk and Surveillance-System Monitor (R. 623). The transferability of Powers' skills to these jobs was rated only "fair," meaning that Powers would have to be trained "in Tools and/or Materials" in order to do them (R. 623). Based on this information, Hartford determined on July 8, 2000, that Powers was totally disabled from any occupation and entitled to continued benefits beyond the initial 24-month period (R. 10).

Annual reviews were subsequently conducted (R. 13-14, 16, 17, 19, 528-31, 541-44, 551-54, 566-68). In each review up through 2005, Hartford determined that Powers was totally disabled from any occupation and continued Powers' benefits. For example, on April 23, 2001, examiner Angelica Mccaw wrote that "Clmt passed TC as no sedentary occs were found." (R. 13-14). On January 13, 2003, examiner John Ficke stated, "We extended this past TC because we found no occs at the Sed level. . . . This is a good candidate [for settlement] because we may be able to say she can do sed occ but will not likely find occs." (R. 16). On March 4, 2004, examiner Christina Marks found that Powers was totally disabled and entitled to continued

3

monthly benefits (R. 17). On January 27, 2005, Ms. Marks wrote that "Medical information supports that [Powers] continues to remain TD" and continued Powers' benefits (R. 19-20). Marks diaried the case for the next annual review in December 2005 (R.20).

In the meantime, a March 1, 2004, MRI of the left knee showed patellofemoral and medial compartment osteoarthritis (R. 458-59). On April 20, 2004, orthopedic surgeon Jim D. Swanson, M.D., performed a left knee arthroscopic partial lateral meniscectomy, with debridement of articular cartilage and bone spurs and lateral retinacular release (R. 454).

On October 10, 2005, Powers called the Plan to advise that she had taken in a foster child (R. 20). She wondered if the money she received as a result would be considered wages earned (R. 20). Powers had consistently acknowledged that she had two adopted boys, one born in 1993 and the other in 1999 (R. 20, 25, 212, 529, 542, 552, 567, 801). Now, she had a question about whether the income she received from foster parenting would affect her benefit amount (R. 20).

The next day, her file was referred to the Plan's Special Investigative Unit (R. 31).

Surveillance of Powers was done on October 24-26, 2005 (R. 234-40). The 2 ½ days of surveillance resulted in 47 minutes of videotape (R. 234). The majority of the video shows Powers sitting in a McDonald's for 28 minutes (R. 238).

On November 29, 2005, Powers' file was assigned to Senior Investigator Edward Golden, Jr. (R. 205). On January 6, 2006, Golden met with Powers (R. 206-16, 415-26).

Powers told Golden that on a good day, she is able to sit for a maximum of 30 minutes at one time (R. 211, 420). On a bad day, she stays close to home and limits her activities (R. 213, 422). She usually has two good days per week and one to two bad days per week (R. 213, 422). Powers stated that she does some light housekeeping, and her friends and her 12-year-old son do the heavy housecleaning and other chores (R. 212, 421). She added, "My children are old

4

enough to really take care of themselves. They are actually very helpful to me and my situation." (R. 212, 421).

Golden observed that Powers' movements "appeared slightly slow and she had a slight limp, which is consistent with what was viewed during the activity check." (R. 207, 416). Golden noted that Powers got up and down four to five times during the 2 ½ interview (R. 206, 207, 415, 416), and "appeared stiff when she first stood up and began to walk, but then seemed to loosen up and move more fluidly after the first few steps." (R. 207, 416). Golden concluded that Powers "presented herself, and responded during the interview, in a consistent manner with the surveillance video activity check. . . ." (R. 216, 426).

On January 24, 2006, Hartford's Jody Wilkins, a nurse, wrote that it was inconsistent that Powers "is single & cares for 2 adopted children (12 & 7) & 1 foster child (10 yo) but yet reports that she is unable to work in any capacity." (R. 24-25). Wilkins suggested that Powers could perform sedentary work (R. 25).

On February 22, 2006, the case was referred to Todd J. Lyon, M.D., a certified independent medical examiner who is board certified in family practice (R. 27, 34, 396). On March 7, 2006, Dr. Lyon wrote to Wilkins (R. 28-34, 387-96).

Dr. Lyon noted that he had reviewed medical records from 1995 to February 2006, the video surveillance, and Golden's interview, among other things (R. 28, 387). He described Powers' medical history, stating initially that

> Her primary subjective complaints have been low back and neck pain as well as knee pain, especially on the left. Ms. Powers has documented significant degenerative joint disease of the left knee and has had arthroscopic surgery on this knee for purposes of a partial meniscectomy and chondroplasty. Ms. Powers also has spondylolisthesis and degenerative disk disease at L5-S1 with a history of previous lumbar laminectomy.

5

(R. 28, 288). Dr. Lyon added that a March 24, 1998, MRI of the lumbar spine showed a "grade I spondylolisthesis of L5 on S1," as well as "[s]evere L5-S1 degenerative changes . . . on the left side of the disc space." (R. 29, 388).

Dr. Lyon also noted the April 20, 2004, knee surgery and stated that this surgery "documented significant degenerative changes involving her articular cartilage as well as a lateral meniscus tear." (R. 30, 390).

In his Discussion and Medical Rationale section, Dr. Lyon wrote that the findings of the lumbar spine MRI "suggest that Ms. Powers may have some degree of abnormal motion at the L5-S1 segments as well as degenerative changes seen at that segment. This could explain her complaint of low-back pain. . . ." (R. 32, 393). Because of Powers' lumbar condition, Dr. Lyon concluded that "she would . . . require the freedom for periodic changes in position, especially while seated throughout the day." (R. 32, 393).

In addition, Dr. Lyon wrote that because of Powers' "significant left knee degenerative disease," she is precluded from prolonged weight bearing activities such as standing and walking (R. 32, 393, 394). Moreover, according to Dr. Lyon, "[i]t is likely that this is a condition that will continue to degenerate and Ms. Powers is at higher risk than average for requiring a left knee replacement in the future. This condition is not likely to improve." (R. 32, 394).

Dr. Lyon reviewed the surveillance video and found "Ms. Powers' activities as documented by the video surveillance to be fairly consistent with her reported abilities during her claimant interview with Mr. Golden." (R. 33, 394).

Dr. Lyon concluded that Powers cannot do prolonged standing or walking, cannot lift more than 20 pounds, can sit for 30 minutes at a time, but requires the freedom to adjust positions periodically throughout the day, particularly with prolonged sitting (R. 33, 395).

On March 13, 2006, Wilkins, on behalf of Hartford, adopted Dr. Lyon's assessment (R. 34). The file was then forwarded for an Employability Analysis Report (R. 35).

The analysis was done using OASYS (Occupational Access System), a computerized job matching system that utilizes the Dictionary of Occupational Titles (R. 366). According to the Employability Analysis Report (R. 365-82), "[t]he job person match was run at the Sedentary strength level." (R. 366). The report yielded four jobs: surveillance-system monitor, lens block gauger, button reclaimer, and table worker (R. 368). The report stated that "[a]ll positions are prevalent in the National Economy," but did not mention how many of such jobs exist (R. 368).

The report also contained information about how good the match was (R. 369). The Transferability Table lists four "match types," from best to worst: "Closest" (with excellent transferability and minimum training required); "Good" (with good to moderate transferability and the need for some training); "Fair" (with only fair transferability and a definite need for training "in Tools and/or Materials"); and "Potential" (with low transferability and a definite need for training in both tools and materials) (R. 369). The surveillance-system monitor job was shown as having only "fair" transferability (R. 369). The other three jobs were listed as having only a "potential" level of transferability (R. 369).

On April 14, 2006, Investigative Specialist Randy Pagarigan wrote a letter advising Powers that she was no longer disabled and that, as a result, her benefits would be stopped (R. 219-28). He noted that although Powers presented herself, and responded, during the interview with Golden in a consistent manner with the surveillance video, her stated abilities and

7

limitations were inconsistent with the restrictions and limitations provided by her physician (R. 224). Pagarigan related that Dr. Lyon concluded that Powers could do sedentary work as long as it did not involve prolonged standing, prolonged walking, or sitting for more than 30 minutes at a time, and as long as it allowed her the freedom to adjust her position throughout the day (R. 225). Pagarigan added that based on the functional capabilities described by Dr. Lyon, an Employability Analysis concluded that Powers could do the jobs of surveillance-system monitor, lens block gauger, button reclaimer, and table worker (R. 227). According to Pagarigan's letter, all four jobs "are prevalent in the National Economy." (R. 227).

Counsel for Powers wrote to Hartford on November 29, 2006, requesting that Powers' benefits be resumed because, among other things, (1) Powers' condition had not improved since she was found disabled at her most recent review; and (2) vocational evidence showed that Powers was still disabled (R. 278-82). Counsel attached a report (R. 325-26) and *curriculum vitae* (R. 327-33) from vocational expert Constance R. Brown. Ms. Brown wrote that based on data from the United States Census Bureau and the United States Bureau of Labor Statistics, the jobs of lens block gauger, button reclaimer, and table worker do not exist (R. 325). In addition, these three jobs do not allow for the liberal sit-stand option that Powers requires (R. 326). Brown also concluded that all four jobs listed by Hartford allow no absences during an initial six-week to six-month probation period, and after the probation period, no more than one absence per month (R. 326).

On February 1, 2007, Edna Golych, Appeals Specialist, wrote counsel that the decision to terminate benefits was being upheld (R. 98-107). The point that Powers had not improved since the previous review found her totally disabled was not addressed (R. 105-06) (discussing Powers' condition but not how it compared to her condition at the previous review). In response

to counsel's discussion of vocational evidence, Golych stated that the jobs identified are "prevalent in the national economy." (R. 106). The absenteeism issue was not addressed.

### IV.     Summary of Argument

The termination of Powers' long-term disability benefits was arbitrary and capricious for any one of several reasons.

As recently as January 27, 2005, Powers was found totally disabled because she was unable to perform the essential duties of any occupation. There is no evidence of medical improvement between then and April 14, 2006, when she was found to be able to work. Although there was no change in medical condition and no change in the definition of disability, Hartford found her disabled in January 2005 and not disabled in April 2006.

Powers' benefits were terminated because Hartford determined that she could perform the jobs of surveillance-system monitor, lens block gauger, button reclaimer, and table worker. The last three jobs do not exist. Even if they did, they would not allow Powers the freedom she needs to change positions.

When the definition of "disabled" changed for Powers in 2000 from the inability to do her own occupation to the inability to do any occupation, Hartford conducted a "hypothetical transferable skills analysis." No good matches were found. One match that would have required training for Powers was the job of surveillance-system monitor. Hartford determined in 2000 that this was not a good match for Powers, and held in 2000 that Powers could not perform the essential duties of that or any other occupation. In 2006, Powers still needed training to do the job of surveillance-system monitor. As a result, it is not a job Powers is qualified to do by reason of her education, training, or experience. The job of surveillance-system monitor was not a good match for Powers in 2000, and it was not a good match for her in 2006.

OASYS, the computerized job matching system used by Hartford, showed that the job of surveillance-system monitor was not a good match for Powers. It also showed that the jobs of lens block gauger, button reclaimer, and table worker were not good matches for Powers.

Finally, no one has questioned Powers' credibility and no one has disputed Powers' statement that she has one to two days per week when she stays close to home and limits her activities. The uncontroverted vocational evidence is that absences of more than one day per month would prevent Powers from being able to sustain the four jobs listed by Hartford.

V.      Argument

Powers does not dispute that the standard of review is whether the termination of Powers' benefits was arbitrary and capricious. Powers does not contest Dr. Lyon's assessment of Powers' abilities and limitation, which was adopted by Hartford. Nonetheless, the termination of Powers' benefits was "downright unreasonable" for any one of several reasons.

   A.   **Powers' condition has not improved since January 27, 2005, when she was found totally disabled for any occupation.**

Powers was initially found entitled to benefits because she could no longer perform the essential duties of her own occupation (R. 667-68). Her benefits started effective June 25, 1998 (R. 669). Two years later, Hartford determined that Powers was totally disabled from *any* occupation, and continued her benefits (R. 10). In each annual review up through and including 2005, Hartford found that Powers continued to be disabled from any occupation, and benefits were continued (R. 13-14, 16, 17, 19). On January 27, 2005, Hartford examiner Christina Marks wrote that medical information supported that Powers remained totally disabled (R. 19-20). Powers' benefits continued (R. 20).

10

On April 14, 2006, Hartford wrote Powers that she was no longer disabled (R. 219-28). The file contains no evidence of medical improvement between January 27, 2005, when Hartford found Powers totally disabled, and April 14, 2006, when Hartford found Powers no longer disabled.

In addition to common sense, the case of *McDonald v. Western-Southern Life Ins. Co.*, No. C2-98-414, 2001 U.S. Dist. LEXIS 25407 (S.D. Ohio Dec. 14, 2001), shows that the lack of evidence of improvement indicates that the decision to terminate benefits was arbitrary and capricious. There, McDonald had been entitled to long-term disability benefits since 1988 because he was unable to engage in any occupation. *Id.* at *4. After his benefits were stopped in 1997, the Court reviewed the termination under the arbitrary and capricious standard. The Court held:

> Defendants found that Mr. McDonald satisfied the definition of "long-term disabled" from 1988 through 1997 and continued his long-term disability benefits during that time. The opinions of Plaintiff's treating physicians had not changed in 1997 when Defendants decided to terminate his benefits. This suggests that Defendants acted in an arbitrary and capricious manner in deciding to terminate Plaintiff's benefits.

*Id.* at *32-33. The Court entered judgment for McDonald on his claim to recover benefits. *Id.* at 46.

Here, there is no evidence of medical improvement between January 27, 2005, when Powers was found totally disabled, and April 14, 2006, when she was found no longer disabled. In other words, the same conditions and level of severity that were found disabling on January 27, 2005, were found not disabling on April 14, 2006. There had been no change in the definition of "disabled", and no change in Powers' condition; yet she was found disabled on one

11

day and not disabled on another. As in *McDonald*, this suggests that the Plan acted in an arbitrary and capricious manner in deciding to terminate Powers' benefits.

> **B.** **The jobs of lens block gauger, button reclaimer, and table worker no longer exist.**

In its computerized job matching analysis, Hartford found four jobs that it believes that Powers can do: surveillance-system monitor, lens block gauger, button reclaimer, and table worker (R. 368). The last three jobs listed no longer exist.

Hartford utilized OASYS (R. 366). OASYS cross references an individual's qualifications profile with 12,741 occupations classified by the United States Department of Labor in the 1991 Dictionary of Occupational Titles. *Barchus v. Hartford Life & Accident Ins. Co.*, 320 F.Supp.2d 1266, 1278 (M.D. Fla. 2004). Based on its OASYS report, Hartford concluded that all four of the listed jobs were "prevalent" (R. 368). No support for its conclusion was provided.

Powers furnished to Hartford a report from vocational expert Constance R. Brown (R. 325-26). Based on data from the United States Census Bureau and the United States Bureau of Labor Statistics, Brown wrote that the jobs of lens block gauger, button reclaimer, and table worker do not exist (R. 325).

Common sense suggests that a person cannot be found able to work because she can do a job that no longer exists. Although Powers has not found a case directly on point, courts have strongly implied that when jobs are cited that an insured could do, those jobs have to exist. *See, e.g., Das v. UNUM Life Ins. Co. of Am.*, No. 05-2408, 2007 U.S. App. LEXIS 6065, at **11 (3rd Cir. March 13, 2007) ("[t]here has been no information submitted that would indicate that either of these two occupations does not exist within the national economy"); *Calvert v. Firstar*

*Fin., Inc.*, 409 F.3d 286, 290-91 (6th Cir. 2005) (following a transferable skills analysis, a labor market survey showed that the jobs existed); *Reichert v. Liberty Life Assurance Co. of Boston*, No. 05-2518, 2007 U.S. Dist. LEXIS 8347, at *12 (D. N.J. Feb. 5, 2007) (a labor market study showed the existence of jobs that Plaintiff could do); and *Atkinson v. The Prudential Ins. Co. of America*, No. 3:05CV00140 JLH, 2006 U.S. Dist. LEXIS 46520, at *30 (E.D. Ark. June 14, 2006) ("Prudential must conduct an appropriate vocational evaluation to determine whether any sedentary occupations exist for which Atkinson is reasonably fitted. . . .").

### C. The jobs of lens block gauger, button reclaimer, and table worker would not allow Powers the freedom she needs to change positions.

Even if the jobs of lens block gauger, button reclaimer, and table worker did exist, Powers would not be able to do them. In the opinion of Hartford's reviewing physician, Dr. Lyon, Powers can sit for 30 minutes at a time but requires the freedom to adjust positions periodically throughout the day (R. 33, 395). Hartford adopted Dr. Lyon's opinions (R. 34).

Vocational expert Constance Brown noted that the jobs of lens block gauger, button reclaimer, and table worker are production inspectors in the optical, knitting, and felt-based linoleum manufacturing industries (R. 325). As such, they are production jobs (R. 326). Brown then added, "Changing position every thirty minutes would interfere with production quotas of the worker and any other workers who depended on them. In my opinion, such a liberal sit-stand option [as required by Powers] does not work well in these type jobs." (R. 326).

There is no evidence to the contrary. In fact, it appears that the information entered into OASYS was that Powers could do the full range of sedentary activity. The Employability Analysis Report states that "The job person match was run at the Sedentary strength level." (R. 366). Thus, it appears that OASYS did not know that Powers is limited to less than the full

range of sedentary activity because she can sit for no longer than 30 minutes at one time and needs to be free to adjust positions periodically throughout the day (R. 33, 34, 395).

### D. Hartford previously found that the job of surveillance-system monitor was not a good match for Powers.

The lone job left on Hartford's list is that of surveillance-system monitor.

In January 2000, as Powers approached the end of the initial 24-month period for which she received benefits because of her inability to do her *own* occupation, Hartford undertook a "Hypothetical Transferable Skills Analysis" to determine whether Powers could do *any* occupation (R. 618-26). The analysis assumed that Powers could perform the full range of sedentary activity (R. 618).

The analysis found no matches "at the good level of Transferable Skills." (R. 618). An extension of the parameters of the search to include jobs that would be less feasible resulted in two occupations: election clerk and surveillance-system monitor (R. 623). The transferability of Powers' skills to these jobs was only "fair," meaning that Powers would have to have training before she could do these jobs (R. 623). In the policy, "Any Occupation" is defined as an occupation for which the insured is already qualified by education, training, or experience (R. 80). Based on the information from the Hypothetical Transferable Skills Analysis (and presumably the language of the policy), Hartford found on July 8, 2000, that Powers was totally disabled from any occupation and entitled to benefits beyond the initial 24-month period (R. 10).

Now, Hartford is using that same surveillance-system monitor job to terminate benefits. In 2000, the job was only a fair match, meaning that Powers would need training before she could perform it (R. 623). In 2006, the job of surveillance-system monitor was only a fair match, meaning that Powers would need training before she could perform it (R. 369). In 2000, the job

14

and the transferability match were not good enough to terminate benefits; yet in 2006, exactly the same job and exactly the same match were given as a reason for stopping benefits. This suggests that the Plan acted in an arbitrary and capricious manner when it terminated Powers' benefits.

### E.     According to OASYS, none of the four jobs listed is a good match for Powers.

The OASYS software places jobs into one of four categories: "Closest," "Good," "Fair," and "Potential" (R. 369). "Potential" is the category that represents the weakest match between the claimant's capabilities and the job duties. *Garrett v. The Hartford Life and Accident Ins. Co.*, No. 4:07CV00065 JLH, 2007 U.S. Dist. LEXIS 82919, at *18 (E.D. Ark. Nov. 8, 2007). "Potential" means that the transferability of the claimant's skills to the potential occupation is low. *Id.* "Fair" indicates fair transferability but would require a plan and some training. *Id.* at *19. Thus, for jobs at both the "potential" and "fair" levels, the worker *must* be trained before she is able to do the job (R. 369).

The surveillance-system monitor job was only a "fair" match for Powers (R. 369). The other three jobs listed are only "potential" matches for Powers (R. 369). All four of these jobs would require Powers to be trained before she could do them (R. 369).

According to the policy, "Any Occupation" is defined in part as an occupation "for which you are qualified by education, training, or experience. . . ." (R. 80). It does not include jobs Powers might be able to do with additional training. Because Powers is not able to do any of the four jobs with her current education, training, and experience, the termination of her benefits was arbitrary and capricious.

15

     **F.**    **Absenteeism would prevent Powers from being able to sustain any of the four jobs listed by Hartford.**

At the January 6, 2006, interview with Edward Golden, Jr., Powers stated that on a good day, she can sit for 30 minutes at one time (R. 211, 420), but on a bad day, "I stay close to home and limit all my activities. I make myself get up and I don't worry about the house or anything else. I rest and sit all day and watch TV or lie on the couch." (R. 213, 422). She told Golden that she usually has two good days per week and one to two bad days per week (R. 213, 422).

No one has questioned Powers' credibility. In fact, Golden (R. 216, 426), Dr. Lyon (R. 33, 394), and Investigative Specialist Randy Pagarigan (R. 224) all noted that Powers presented, and responded, during the interview with Golden in a manner consistent with the surveillance video. No one has questioned, either directly or impliedly, that Powers has one to two bad days per week in which she stays close to home and limits her activities (R. 213, 422).

Vocational expert Constance R. Brown wrote that all four jobs listed by Hartford allow no absences during an initial six-week to six-month probation period, after which the worker would be allowed no more than one absence per month (R. 326). This evidence is uncontroverted. Because Powers would likely miss at least one day *per week*, she would be unable to sustain any of these jobs.

**VI.**    **Conclusion**

Following a 21-year career with the United States Postal Service as a rural mail carrier, Terri Powers filed for long-term disability benefits in 1998. Her claim was approved on the basis of chronic low back pain, lumbar facet arthritis, and spondylolisthesis.

For the first 24 months of her entitlement, the Plan considered her disabled if she was unable to perform the essential duties of the job of rural mail carrier.  Thereafter, she was considered disabled only if she was able to perform the essential duties of any occupation.

As the end of the initial two-year period approached, Hartford performed a hypothetical transferable skills analysis to see if there were any jobs that Powers, with an ability to do the full range of sedentary activity, could perform.  Hartford found no such jobs.  Hartford considered the job of surveillance-system monitor, but recognized that it was not a good match for Powers.

From 2001 through 2005, Hartford conducted annual reviews of Powers' case.  Each year, Hartford determined that Powers was unable to perform the essential duties of any occupation and continued benefits.  On January 27, 2005, for example, a Hartford examiner wrote that medical information supported that Powers remained totally disabled.

A special investigation of Powers' case was started in October 2005 and ended with an April 14, 2006, letter advising Powers that her long-term disability benefits were being terminated because she was able to perform the jobs of surveillance-system monitor, lens block gauger, button reclaimer, and table worker.

The decision to terminate Powers' benefits is arbitrary and capricious for several reasons.

For one thing, Powers' condition did not improve from January 27, 2005, when she was found disabled, to April 14, 2006, when she was found not disabled.  There had been no change in the definition of disabled, and no change in Powers' condition; yet she was found disabled on one day and not disabled on another.

In addition, the jobs of lens block gauger, button reclaimer, and table worker no longer exist.  Hartford claims that they are "prevalent", but provides no support for that conclusion.  On

17

the other hand, vocational evidence in the file, based on a review of Census Bureau and Bureau of Labor Statistics data, shows that these three jobs do not exist.

Even if those three jobs did exist, they would not accommodate Powers' limitations. It is undisputed that Powers needs the freedom to change positions periodically throughout the day. The uncontroverted vocational evidence is that these three jobs are production jobs which would not allow her the sit-stand option she requires.

That leaves only the job of surveillance-system monitor. Hartford determined in 2000 that this job was not a good match for Powers; it was no better in 2006. According to Hartford's own analysis, Powers would have to have training before she could perform the job of surveillance-system monitor. Thus, it is not a job for which Powers is already qualified for by reason of her education, training, or experience, and cannot be a basis for the termination of benefits.

In fact, the computer software used by Hartford showed that none of the four jobs listed by Hartford are a good match for Powers. For each of the four jobs, Powers would have to be trained before being able to perform the essential duties of the job.

Finally, it is uncontroverted that Powers has one to two "bad days" per week in which she stays close to home and limits her activities. The undisputed vocational evidence in the file is that an absence of more than one day per month would prevent Powers from sustaining any of the four jobs listed by Hartford. Thus, absenteeism alone would prevent Powers from being able to perform these four jobs.

Each of these six reasons shows that Hartford's termination of Powers' long-term disability benefits was "downright unreasonable." Thus, Hartford's decision was arbitrary and capricious and should be reversed.

Therefore, Powers respectfully requests that this Court reverse the decision to terminate her long-term disability benefits. Powers requests that this Court order that Powers' benefits be reinstated, with back pay and pre-judgment interest. Powers also requests that this Court order Defendant to pay Powers' attorney fees upon the proper filing of a post-decision motion for fees.

By:   /s/ Timothy J. Vrana
     Timothy J. Vrana, #1841-03

Timothy J. Vrana
TIMOTHY J. VRANA
636 Third Street
P. O. Box 527
Columbus, IN  47202
(812) 375-9306
Fax (812) 375-9304
tim@timvrana.com

CERTIFICATE OF SERVICE

I certify that the foregoing Brief in Support of Plaintiff's Complaint was filed electronically and served on counsel of record via the Court's CM/ECF system, on December 3, 2007 to:

    Mark E. Schmidtke
    Eric P. Mathisen
    Emathisen@hwelaw.com

     /s/ Timothy J. Vrana
    Timothy J. Vrana