UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| TERRI POWERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CASE NO. 4:07-cv-0062-DFH-WGH |
| NATIONAL RURAL LETTER CARRIERS' | ) |
| ASSOCIATION LONG-TERM DISABILITY | ) |
| INCOME PLAN, | ) |
| | ) |
| Defendant. | ) |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Terri Powers worked as a rural mail carrier for more than twenty

years.  On June 18, 1998, she applied for long-term disability benefits from

defendant National Rural Letter Carriers' Association Long-Term Disability Income

Plan ("the Plan").  The plan administrator was The Hartford Life and Accident

Insurance Group.  Powers' claim was approved, and she received benefits through

2005.  After Powers notified Hartford that she had taken in a foster child, it

undertook a special investigation and conducted surveillance.  Hartford

determined in April 2006 that Powers was not "disabled" as the term is defined in

the Plan, and it listed four potential jobs she could perform.  Powers appealed to

request a resumption of benefits, but Hartford denied that request on February 1,

2007.  The Plan is governed by the Employee Retirement Income Security Act

(ERISA), and Powers seeks relief under 29 U.S.C. § 1132(e).  The issue is whether

the Plan's decision to terminate benefits was arbitrary and capricious.  Since the Plan has failed to show the availability of three of the jobs and has not considered whether Powers is sufficiently well to work the fourth job on a daily basis, the decision to terminate benefits was arbitrary and capricious.  Benefits shall be reinstated retroactively to the date they were terminated.

*Findings of Fact*

The parties have submitted the case for a final decision based on the record of Hartford's administrative review of Powers' claim.  These facts are based on that record.  Powers was born in 1956 and began work as a mail carrier in 1977.  She held that position for more than twenty years.  As part of her employment, she was covered by the Plan, which provided long-term disability income benefits if she became disabled.  The plan was administered by The Hartford Life and Accident Insurance Company.  Powers' last date of full employment was March 26, 1998.  On June 18, 1998, she applied for benefits based on back and shoulder limitations, specifically a rotator cuff tear in her shoulder and lumbar spondylosis. R. 799-807.  The application was supported by a diagnosis by Dr. Mark Stinson. The application was approved on October 9, 1998, retroactive to March 27, 1998. The award was "based on the conditions of Chronic Low Back Pain, Lumbar Facet Arthritis and spondylolisthesis."  R. 668.

For Powers' first two years of disability, the terms of the plan defined "disabled" as being unable to perform the duties of a rural mail carrier.  After the first two years, "disabled" meant that she could not perform the essential duties of any occupation.  The term "any occupation" was defined to include any job that Powers was qualified by education, training, and experience to perform, and that had an earnings potential greater than the product of Powers' pre-disability earnings and the benefit percentage for which she was enrolled.  R. 80.

In 2000, when the "any occupation" standard became applicable, Hartford reevaluated Powers' status.  At that time, Hartford assumed that Powers could perform the full range of sedentary activity.  Hartford performed a hypothetical transferable skills analysis and found two jobs, election clerk and surveillance system monitor, that were "fair" matches and would require some training.  R. 618-26.  But those jobs did not provide sufficient wage replacement.  Since Powers' weight (at that time 340 pounds) indicated a likely deterioration of her condition, Hartford determined that she could not perform "any occupation" and that she met the total disability standard.  R. 10.

Powers' status was reviewed annually, and through 2005, those reviews consistently extended benefits.  Her 2005 review was consistent with other reviews.  Powers' own physician, Dr. Vorhies, wrote that Powers would never return to work in part due to her lumbar spondylolisthesis and rotator cuff tear.  Dr. Vorhies also noted that Powers was developing knee joint pathology.  Based

on this information, Hartford's reviewer concluded that the medical information showed that Powers was still totally disabled.  R. 20.

Hartford reevaluated Powers' status after she informed Hartford on October 10, 2005 that she was taking in a foster child.  In addition, Powers was considering teaching life skills to the foster child, for which she would receive taxable income.  Powers already had two adopted children of her own.  R. 20.  In response to this report, Hartford transferred the Powers file to its Special Investigations Unit.  The investigation unit conducted surveillance of Powers.  She was videotaped on two different occasions at a fast food restaurant.  On the first day, she was observed driving and getting in and out of the car.  On the second day, she sat, without visible discomfort, for twenty-eight minutes at a table inside the restaurant.

On January 6, 2006, Powers was interviewed by a Hartford representative in her home.  Powers viewed the surveillance video.  Hartford's report stated that Powers said the video "represented her normal/average level of functionality."  R. 23.  Her physical capabilities during the interview were consistent with what was shown on the video.  As part of the interview, Powers gave a statement.  The statement listed her capabilities on her "best day" as including the ability to walk and stand for twenty minutes, to sit for thirty minutes, and to lift up to twenty pounds.  R. 209-11.  Her statement claimed that she was having an "average" day

and that she had two "best" days per week and one to two "bad" days per week. R. 213.

In this review, Hartford noted that Powers had undergone gastric bypass surgery in 2001.  After the in-home interview in January 2006, Hartford noted that she had lost 124 pounds.  This was not the first time Hartford became aware of her weight loss.  Powers noted in 2004 that her weight was down to 237 pounds.  R. 520.

At Hartford's request, Dr. Todd Lyon, a certified independent medical examiner, reviewed Powers' medical records and the report from the investigative unit.  R. 28-34.  Dr. Lyon concluded that "Ms. Powers' reported limitations and subjective complaints are fairly consistent with her medical findings and documented diagnoses."  R. 33.  He noted likely restrictions on Powers' ability to work, including lifting 20 pounds, limitations on her ability to move, and a need to adjust positions periodically throughout the day.  R. 33.

Hartford viewed these findings as allowing for full-time sedentary work as long as Powers would have the ability to change positions and the job would not require prolonged standing or walking.  This analysis was reported to Dr. Vorhies, Powers' personal physician.  Dr. Vorhies refused to take a position on Powers' capacity to perform work and recommended a functional capacity evaluation.  In response to Dr. Lyon's report, Dr. Vorhies wrote to emphasize that Dr. Lyon's

report and Dr. Vorhies' own observations were "not sufficient to make the needed determination!"  R. 35.

Despite Dr. Vorhies' repeated recommendations, a functional capacity evaluation was never given.  Hartford determined that Powers could perform sedentary work.  Her file was forwarded for an employability analysis.  Maggie White performed the analysis and assumed that Powers could perform sedentary work with some limitations.  This information and Powers' educational and work history were plugged into the Occupational Access System (OASYS), a computerized job matching system based on the Dictionary of Occupational Titles. R. 366.  The program returned four jobs that Powers supposedly could perform: surveillance-system monitor, lens block gauger, button reclaimer, and table worker.  R. 368.  The surveillance-system monitor was considered a "fair" match, meaning a definite need for training in tools and/or materials.  The other three jobs were potential matches, meaning a definite need for training in both tools and materials.  R. 369.

Based on this report, Hartford terminated benefits.  On April 14, 2006, Investigative Specialist Randy Pagarigan wrote Powers to say that she was no longer disabled and that her benefits would be terminated.  R. 219-28.  Hartford spelled out its final determination that the "weight of the medical evidence in your file . . . supports that you are capable of full-time Sedentary level work."  R. 227. The surveillance video and Powers' own statements about her abilities "were

inconsistent" with the previous restrictions recommended by Dr. Vorhies that had led to the previous continuation of benefits.  Dr. Vorhies' repeated calls for an independent functional capacity evaluation were "of limited benefit for Sedentary work capacity and may be invalid due to efforts in a clinical environment versus those activities documented in the community."  R. 227.

Powers appealed this determination, stating that her condition had not improved and that vocational evidence showed that she was still disabled.  R. 278-82.  The second contention was based on a report that Powers submitted with her appeal by vocational expert Constance Brown.  Brown determined that three of the four jobs Hartford found appropriate for Powers – lens-block gauger, button reclaimer, and table worker – simply do not exist in Indiana.  Brown also stated that all of these jobs would have a probationary period where no absences would be tolerated, followed by allowing at most one absence per month.  According to Powers, she has one or two "bad days" a week, which would render her unable to work.  R. 278-80.  The appeal was rejected by Hartford, which reviewed Powers' medical evidence and stated without elaboration that the proposed jobs were "prevalent in the national economy."  R. 106.  As part of the review process, Hartford relied on a file review by Dr. Georgette Chekiri.  Hartford's attempts to reach Dr. Vorhies were unsuccessful.

*Conclusions of Law*

I.      *Standard of Review*

The parties agree that the standard of review under ERISA in this case is whether the Plan's termination of Powers' benefits was arbitrary and capricious. Under the arbitrary-and-capricious standard, an administrative decision will be overturned only if it is unreasonable.   *Hess v. Reg-Ellen Machine Tool Corp. Employee Stock Ownership Plan*, 502 F.3d 725, 727 (7th Cir. 2007).   Absent unusual circumstances, such as fraud or bad faith, a decision to deny benefits is not deemed arbitrary and capricious if it is possible to offer a reasonable explanation for that decision based on the evidence.   See *Trombetta v. Cragin Federal Bank for Savings Employee Stock Ownership Plan*, 102 F.3d 1435, 1438 (7th Cir. 1996); see also *Mers v. Marriott Int'l Group Accidental Death and Dismemberment Plan*, 144 F.3d 1014, 1021 (7th Cir. 1998) (stating that courts are not to set aside a plan administrator's denial of benefits that is "based on a reasonable interpretation of the plan documents").

A decision is arbitrary and capricious "only when the decisionmaker 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence . . ., or is so implausible that it could not be ascribed to difference in view or the product of . . . expertise.'" *Trombetta*, 102 F.3d at 1438, quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985).   The arbitrary and capricious standard of review requires the court to

evaluate "the impartiality of the decisionmaking body, the complexity of the issues, the process afforded the parties, the extent to which the decisionmakers utilized the assistance of experts where necessary, and finally the soundness of the fiduciary's ratiocination." *Chalmers v. Quaker Oats Co.*, 61 F.3d 1340, 1344 (7th Cir. 1995); see also *Hughes v. Life Ins. Co. of North America*, 112 F. Supp. 2d 780, 793 (S.D. Ind. 2000) (applying *Chalmers* factors).

II.    *Powers' Lack of Improvement*

Powers' first argument is that Hartford's decision was arbitrary and capricious because her condition had not improved since Hartford's most recent decision to continue benefits.  Since briefing in this case, the Seventh Circuit has definitively rejected this legal argument.  In *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 831-32 (7th Cir. 2009), the Seventh Circuit rejected an argument that the plan administrator had to show an improvement in the claimant's condition before terminating disability payments.  The court explained that "the previous payment of benefits is just one . . . factor, to be considered in the court's review process; it does not create a presumptive burden for the plan to overcome."  *Id.* at 832.

The fact that Powers' condition did not change after Hartford approved continuation of her benefits by itself is not proof of arbitrary and capricious behavior.  If Powers had actually been exaggerating her symptoms and Hartford

had discovered it, then Hartford would have been within its rights to terminate benefits even though her actual health had not improved.  Nobody disputes that Powers has serious impairments, nor does anyone question her credibility.  Still, Hartford's decision was based on what it described as an improved understanding of Powers' limitations.  The crucial determination was Hartford's decision that the reports from Dr. Vorhies that it had relied on previously were not accurate.  As described in the benefit termination letter to Powers:  "Dr. Vorhies provided restrictions and limitations that were inconsistent with your reported activities and the activities that you were observed participating in during the video surveillance."  R. 227.  It was not arbitrary and capricious for a Plan to undertake further investigation and to find that previous information that had provided support for giving benefits was incorrect.  Whether Hartford's changing position was arbitrary in this case is a separate issue addressed below.

III.    *Suitability of Three Jobs*

Powers raises several arguments about why the three jobs of lens block gauger, button reclaimer, and table worker do not support termination of benefits. First, she argues that those jobs no longer exist. On this record, both sides have provided incomplete answers on this issue. Powers submitted a statement from vocational expert Constance Brown saying that these three jobs do not exist in Indiana. The Plan provided the conclusory statement that: "All occupations are prevalent in the National Economy." R. 227. The Plan got its data from the OASYS system, which is based on the Department of Labor's Dictionary of Occupational Titles. This court has no problem with the Plan using OASYS, but the system and its outputs do not provide complete insulation from review. In the appeals process, Powers provided Brown's report saying that these jobs do not exist in Indiana. Rather than identifying where the jobs exist, Hartford merely repeated the statement that the jobs were "prevalent in the national economy." R. 106. Even under the deferential review standard, this court needs to know the basis for the plan administrator's determination of a contested point. The OASYS system's outputs do not automatically survive judicial review without any understanding of the basis for those outputs. Hartford should have responded to Brown's report with the actual numbers and locations of these jobs.

This failure is particularly troubling in view of other factors relevant to these three jobs. The first problem is that, according to Brown, the three jobs do not

provide for the liberal sit-stand option that all parties agree is necessary for Powers.  The input into OASYS appears to have required only "sedentary" work. The Plan has no real response to this deficiency in determining the suitability of these three jobs.  It states merely that "Hartford's expert found that the production positions did meet the specific restrictions and limitations suggested by Dr. Lyon."  Def. Br. at 23.  Hartford's expert was the person who failed to adjust the inputs into the system that required job matches to have a sit-stand option.  If that sort of input is not available in OASYS, then unexplained and uncritical reliance on the system could easily be arbitrary and capricious.  Even Dr. Lyon's report concludes that Powers "will require the accommodation for the freedom to adjust positions periodically throughout the day, particularly with prolonged sitting."  R. 33.  Since Powers' appeal included a statement from a vocational expert stating specifically that these three jobs do not provide for such an opportunity, it was arbitrary and capricious to stand by the termination of benefits while failing to provide any evidence that these jobs met the requirements for Powers' employment that Hartford itself found.  For these reasons, Hartford acted arbitrarily and capriciously in considering the jobs of lens block gauger, button reclaimer, and table worker as potential jobs for Powers.  [1]

---

[1]Even under Hartford's system, the match to these three jobs was only "potential."  Powers argues that any match below the classification of "good" does not satisfy the terms of the Plan because such a job requires extra training, and the terms of the Plan call for a job "for which you are qualified by education, training, or experience."  A person can be qualified for a job and still require a reasonable amount of available extra training once that job is procured.  It would not be arbitrary and capricious for the Plan to interpret the language in this manner, at least where the Plan is equally reasonable with respect to actual job

(continued...)

IV.    *Surveillance Monitor Position*

The fourth match provided by the OASYS system was the position of surveillance monitor.  Surveillance monitor positions exist both in Indiana and throughout the country, and that job allows for a sit-stand option and was rated a "fair," not a "potential," match by the OASYS system.  Powers makes two arguments pertinent to the surveillance monitor position.  First, she notes that a review in 2000 specifically considered the surveillance monitor position and found that it was not appropriate.  Second, she argues that the "bad" days she suffers would not allow her to have the consistent attendance needed to keep a surveillance monitor job.

The first argument is not persuasive.  The surveillance system job was considered as part of the initial review when Powers' coverage changed from being based on an inability to perform her job as a mail carrier to an inability to perform any job.  At that time, the Plan rejected the job as a match for Powers for a number of reasons.  Two of those reasons have since changed, thus allowing Hartford to reach a different conclusion.  First, the surveillance system jobs at that point did not provide a sufficient wage to qualify as an acceptable job under the Plan.  Powers is not entitled to benefits if she is qualified to work "any occupation," but that term requires the occupation to provide a sufficient

_____

[1](...continued)
availability.  "A denial of benefits will not be set aside if it is based on a reasonable interpretation of the plan documents."  *James v. General Motors Corp.*, 230 F.3d 315, 317 (7th Cir. 2000).

percentage of wage replacement.   The evaluation in 2000 found that the surveillance system monitor job did not satisfy the applicable sixty percent wage replacement requirement.  Powers does not contest Hartford's determination that the job now provides a wage sufficient to meet the Plan's specifications.

Second, the evaluation in 2000 noted that because of Powers' weight at the time, improvement in her back condition was unlikely.  The one major change in Powers' medical history is that she now weighs a great deal less as a result of the gastric bypass surgery.  For these reasons, it was not necessarily arbitrary and capricious for Hartford to have found in 2000 that she could not perform the job of surveillance monitor and then to have found in 2007 that she could.

Powers' argument that the surveillance job would not allow her to miss days is much more persuasive.   Hartford relied on two independent pieces of information to determine that Powers was no longer disabled: the surveillance tape and the interview with Powers herself.  That interview played a crucial role in the Hartford's determination that she could perform sedentary work and that she was more capable than Dr. Vorhies' previous estimates.   In this same interview, Powers noted:  "On a bad day, I stay close to home and limit all my activities.  I make myself get up and I don't worry about the house or anything else.  I rest and sit all day and watch TV or lie on the couch."  R. 213.  She further stated that she had one or two bad days per week.  This court has not found, and

the Plan has not pointed out, any instance where Powers' credibility has been questioned.

In the information submitted upon Powers' appeal of the termination of benefits, vocational expert Brown wrote: "In my experience, after a probation period of anywhere [from] six weeks to six months in which no absences are normally tolerated, using vacation, sick and personal days, no more than one absence per month is allowed." R. 326. Powers' undisputed statement that she had one to two bad days a week shows that she would not be able to meet these attendance standards and would not be able to keep a surveillance monitor job. Hartford's response to Powers' appeal simply did not include any mention of the absenteeism issue.

The Plan responds with three arguments. The first two are easily dismissed. First, it argues that Brown's characterization of those positions' absentee policies is conclusory and no definitive proof was supplied. Instead, Brown relied on her own experience and a statement that "normally" such restrictions applied. On the record before the court, Brown's statements stand unrebutted, and her resume shows that her experience is ample and provides her with expertise in her field. R. 327-33.

The Plan's second argument is that nothing in Powers' statement about her "bad days" shows that she could not work. This argument is without merit.

Powers stated that she does not leave the house and rests and sits all day.  Her abilities on those days are certainly not what they are on her "average" or "good" days, which provided the basis for Hartford's determination that she could perform full-time sedentary work with a sit-stand option.  Powers stated that on an average day, her pain level is four to five, while on a bad day it is ten on a scale of one to ten.  R. 212.

The Plan's better argument is that Dr. Lyon, Dr. Chekiri, and vocational expert Maggie White all believed that Powers could perform sedentary work. Hartford asserts that it was allowed to rely on those opinions and was not required to defer to the opinion of Brown, plaintiff's own vocational expert.  The Supreme Court has held that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). This rationale applies equally to the independent findings of the plaintiff's own vocational expert.

In this case, the reviewing experts determined that Powers could perform sedentary work, but the problem is that none of them specifically addressed the effect of her bad days.  Hartford relied exclusively on people who considered only Powers' normal or best range of activities.  The surveillance video, which is one of

the two pieces of evidence used to support the decision to terminate benefits, showed only two days in a week and less than one hour of video.  Powers' own testimony is that she has only one or two bad days a week.  Two consecutive "normal" days are not particularly instructive on Powers' ability to work on her bad days.

Keeping in mind the "arbitrary-and-capricious" standard of review, the crux of the matter is that the record does not indicate that any person reviewing Powers' file specifically considered the possibility that she would be unable to maintain a full-time job because of her "bad" days.  Without deciding whether this oversight would be arbitrary and capricious in all situations by itself, several additional factors make the oversight unacceptable in this case.

First, during the appeals process, Hartford received information showing that Powers would not be able to work every day.  Hartford still did not consider the issue.

Second, Powers' condition had not improved from when benefits were granted.  While this lack of improvement does not necessarily show arbitrary and capricious behavior, at least as a matter of law, the change of position still deserves some scrutiny as a "factor, to be considered in the court's review process." *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832 (7th Cir. 2009).  The justification for the changed position was based on less than

one hour of surveillance video and a statement from Powers that was interpreted to show that a normal day for her allowed limited types of sedentary work.   In reversing its previous determination, the Plan acted arbitrarily and capriciously by failing to address the rest of the information from Powers indicating that she could not work every day.

Finally, the seeming universal credence given to Powers' reports about her condition undermines Hartford's decision to cancel benefits.   Powers stated her capabilities in an interview.   Those capabilities on a normal day were consistent with how she acted in the surveillance video and were credited.   It was arbitrary and capricious for the Plan then to ignore completely her contemporaneous statement that she had one or two bad days a week where she could not leave the couch.   A decision is arbitrary and capricious if the decision-maker "entirely failed to consider an important aspect of the problem." *Trombetta v. Cragin Federal Bank for Savings Employee Stock Ownership Plan*, 102 F.3d 1435, 1438 (7th Cir. 1996), quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985); see also, *Leger*, 557 F.3d at 835 (finding an arbitrary and capricious termination of benefits where "the Plan's determination failed to consider Ms. Leger's complete medical history and rejected, without explanation, important aspects" of the functional capacity evaluation).   Effectively, Hartford accepted Powers' statements only when they confirmed the video surveillance and ignored her other statements.   While the corroborating video surveillance was important, it was insufficient on its own to terminate benefits.   It showed less than one hour of Powers' life.   The evidence

about the bad days was ignored without any justification.   Hartford acted
arbitrarily and capriciously in finding that Powers could perform full-time
sedentary work.[2]

Having found that the Plan acted arbitrarily and capriciously in terminating
benefits, the question is the remedy:  restoring benefits or remanding the case for
further findings and explanations?  The resumption of benefits retroactive to their
improper termination is appropriate.   In many ERISA cases where plans have
acted improperly to deny benefits, a remand for further consideration is the
appropriate remedy, but where the plaintiff was actually receiving disability
benefits that were improperly terminated, as in this case, the Seventh Circuit
teaches that the more appropriate remedy is reinstatement of benefits that were
being paid before the improper denial.  *Hackett v. Xerox Corp. Long-Term Disability
Income Plan*, 315 F.3d 771, 775-76 (7th Cir. 2003) (reversing grant of summary
judgment for plan and ordering  reinstatement of benefits that were improperly
terminated); *Halpin v. W.W. Grainger*, 962 F.2d 685, 697 (7th Cir. 1992) (affirming
reinstatement of benefits that were improperly terminated).   "The distinction
focuses on what is required in each case to fully remedy the defective procedures
given the *status quo* prior to the denial or termination."  *Hackett*, 315 F.3d at 776.
In cases where the plan administrator terminates benefits, "the *status quo* prior
to the defective procedure was the continuation of benefits.   Remedying the

---

[2]This failure is also relevant to the three other jobs, providing an
independent reason that Hartford's reliance on those jobs was arbitrary and
capricious.

defective procedures requires a reinstatement of benefits." *Id*; accord, *Schneider v. Sentry Group Long Term Disability Plan*, 422 F.3d 621, 630 (finding that where benefits had been terminated by improper procedures, the "appropriate remedy is an order vacating the termination of her benefits" and directing the Plan to "reinstate retroactively the benefits").

*Conclusion*

For the foregoing reasons, the court will enter final judgment for the plaintiff reinstating benefits retroactive to April 14, 2006.

So ordered.

Date: May 5, 2009

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Timothy J. Vrana
tim@timvrana.com

Eric P. Mathisen
OGLETREE, DEAKINS, NASH, SMOAK, & STEWART,P.C.
eric.mathisen@ogletreedeakins.com

Mark E. Schmidtke
OGLETREE, DEAKINS, NASH, SMOAK, & STEWART,P.C.
mark.schmidtke@ogletreedeakins.com